Bernardo Cruz                                          The Honorable John C. Coughenour
Tony Gonzalez
Lori Jordan Isley
Joachim Morrison
COLUMBIA LEGAL SERVICES
300 Okanogan Ave., Suite 2A
Wenatchee, WA 98801
(509) 662-9681

Adam Berger
Lindsay Halm
SCHROETER GOLDMARK & BENDER
810 Third Avenue, Suite 500
Seattle, Washington 98104
(206) 622-8000

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BARBARO ROSAS and GUADALUPE TAPIA, as individuals and on behalf of all other similarly situated persons,<br><br>                    Plaintiffs,<br>          vs.<br><br>SARBANAND FARMS, LLC., MUNGER BROS., LLC., NIDIA PEREZ, and CSI VISA PROCESSING S.C.,<br><br>                    Defendants. | CLASS ACTION<br><br>Civil Action No. 2:18-CV-0112-JCC<br><br>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION<br><br>NOTE ON MOTION CALENDAR: November 9, 2018 |

## I.      INTRODUCTION

Plaintiffs request class certification, pursuant to Rule 23(b)(3) for monetary damages and Rule 23(b)(2) for injunctive relief, on behalf of a proposed class of approximately 600 H-2A farm workers from Mexico who picked blueberries for Sarbanand Farms, LLC in 2017 and a subclass of approximately 70 workers who were terminated and evicted by Sarbanand for raising safety and health complaints. Plaintiffs propose a "2017 H-2A Blueberry Harvester" class, defined as:

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 1

All Mexican nationals who worked at Sarbanand Farms, LLC in Sumas, Washington picking blueberries pursuant to an H-2A contract that offered employment from July 2017 through October 2017.

The Blueberry Harvester class asserts claims against all defendants for violation of the Washington Farm Labor Contractor Act ("FLCA") arising from the use of unlicensed farm labor contractors to recruit the H-2A workers. The class asserts three additional sets of claims solely against Defendants Munger Bros., LLC and Sarbanand (the "Grower Defendants"): 1) forced labor claims under the federal Trafficking Victims Protection Act ("TVPA") arising from a common scheme of threats and a common practice of abusing the law to keep workers in the fields; 2) a claim for hostile work environment based on national origin in violation of the Washington Law Against Discrimination ("WLAD") arising from these same common practices; and 3) breach of contract claims arising from the Growers' imposition of unlawful production standards and failure to provide adequate food.

Plaintiffs also propose a "Wrongful Termination subclass," which consists of approximately 70 H-2A workers who were terminated and evicted from Sarbanand Farms for protesting dangerous working conditions. The subclass has two legal claims. First, Plaintiffs allege the Grower Defendants wrongfully terminated the subclass for engaging in concerted activity in violation of Washington's Little Norris-LaGuardia Act, RCW 49.32.020. Second, Plaintiffs allege the Growers unlawfully evicted the subclass members under threat of arrest by police or immigration authorities, in violation of Washington's landlord-tenant laws.

The Court should certify Plaintiffs' claims for class treatment because the issues presented are based on common policies and practices susceptible to generalized, class-wide proof; the same evidence will suffice for each member to establish the elements of their claims; and the injunctive relief requested applies to all class members.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2

## II.      FACTUAL BACKGROUND

**Parties and Key Players**

The Grower Defendants, Munger Bros. (based in Delano, California) and Sarbanand Farms, are separate companies owned by Baldev and Kable Munger. Dkt. # 11 at p. 1, ¶¶ 1-2. Both Grower Defendants employed Defendant Nidia Perez in 2017 as Executive Administrator and primary liaison between the H-2A workers and upper management. *Morrison Decl., Ex. 1* at pp. 9-12; Dkt. # 19 at p. 3, ¶ 12; Dkt. # 18 at p. 3, ¶ 12. Munger's CEO is Robert Hawk and Cliff Woolley is Munger's CAO. Dkt. # 12 at p. 3, ¶¶ 18-19.

In 2017, the Grower Defendants applied to the federal government to bring in approximately 600 H-2A workers from Mexico to harvest and package blueberries in California and then in Washington through two separate and sequential contracts.[1] *Morrison Decl., Ex. 2* at pp. 14 & 34, and *Ex. 3* at p. 55; Dkt. # 12 at p. 11, ¶ 96; p. 13-14, ¶¶ 116-19. Munger hired Giovanna Sierra to prepare and file the H-2A paperwork, and Ms. Sierra worked closely with Mr. Hawk, Mr. Woolley, and Ms. Perez. *Sierra Decl.* at p. 2, ¶¶ 11-12, p. 3, ¶¶ 14, 16-17. Munger's California H-2A contracts lasted from May 15th to June 30th, and Sarbanand's Washington H-2A contracts ran from July 10th to October 25th. *Morrison Decl., Ex. 2* at [pp] and *Ex.3* at [pp].

Munger contracted with Defendant CSI Visa Processing S.C., a Mexican labor recruiter with offices throughout Mexico, to supply foreign H-2A workers to both Munger and Sarbanand. Dkt. # 12 at p. 4, ¶¶22, 24; Dkt. # 19 at 11, ¶¶ 87-88; Dkt. # 18 at 10-11, ¶ 88-89. The contract states that CSI will "process individuals who will apply for H-2A visas . . . including individuals

---

[1] Crowne Cold Storage, LLC, yet another company owned or associated with the Munger brothers, submitted two applications, requesting 111 and 60 workers respectively to package blueberries in California from May to June 30, 2017. *Morrison Decl., Ex. 4* at pp. 58-59. Some of these workers are a part of the 600 workers transferred to Sarbanand.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 3

1  recruited by CSI as well as individuals . . . named by Munger . . . as preferred workers."

2  *Morrison Decl., Ex. 5* at p. 61.[2] Ms. Perez's primary contact at CSI was Roxana Macias, whose

3  title was Director of Compliance. Dkt. # 31 at p. 8, ¶ 86; Dkt. # 12 at p. 6, ¶ 43. Neither Ms.

4  Perez nor CSI were licensed or bonded by the State of Washington to operate as farm labor

5  contractors. Dkt. # 31 at p. 8, ¶¶ 82, 84; Dkt. # 12 at p. 11, ¶¶ 92-93.

6  **Recruitment in Mexico**

7    Putative class members who worked for Munger and Sarbanand in 2017 obtained

8  employment through CSI. Either Ms. Perez or a CSI recruiter contacted class members and

9  instructed them to go to the nearest CSI office to fill out paperwork for an H-2A job in the

10  United States. *Rosas Decl.* at p. 3, ¶ 25; *Tapia Decl.* at p. 3, ¶ 24; *Worker Decls.*[3] *(Morrison Decl,*

11  *Exs. 9-31)* at ¶¶ 18-20. Grower Defendants admit that Ms. Perez, as an agent for each company,

12  communicated with putative class members about working for Munger and Sarbanand in 2017.

13  Dkt. # 19 at 11, ¶ 87; Dkt. # 18 at 10, ¶ 87. At the CSI offices in Mexico, none of the putative

14  class members was shown a Washington State farm labor contractor license or proof of bonding.

15  *Rosas Decl.* at p. 4, ¶ 27, *Tapia Decl.* at p. 4, ¶ 26, *Class Decls* at ¶¶ 20-21.

16  **Common Threats and Intimidation Tactics at Munger Farms in California**

17    Once the H-2A workers were in California, Munger had a common practice of

18  intimidating them to keep them fearful of losing their jobs and their livelihood. Putative class

19  members and Ms. Sierra aver that Munger's managers responded to any work-related complaints

20  with the phrase "para Mexico," meaning "go back to Mexico," which workers understood to

21

22    [2] Crowne Cold Storage also contracted with CSI to recruit workers in Mexico in 2017 and Nidia Perez signed that
contract on behalf of Crowne. Dkt. # 19 at 10, ¶¶ 80-81; Dkt. # 18 at 10, ¶¶ 80-81; *Morrison Decl., Ex. 6.*

23  [3] Plaintiffs cite generally to declarations of putative class members as "*Worker Decls.*," filed as Exhibits 9-32 to the
*Declaration of Joachim Morrison.* Due to minor variations in the declarations, citation for each individual declarant
will appear within the cited paragraph range of the declaration.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 4

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA  98801
(509) 662-9681

mean that they could be fired, forced to pay their own way home, and blacklisted from future employment in the United States. *Rosas Decl.* at p. 4-5, ¶¶ 35-36; *Tapia Decl.* at pp. 4-5, ¶¶ 34-35; *Worker Decls.* at ¶¶ 28-31; *Sierra Decl.* at p. 5 ¶ 38-39. Nidia Perez, Munger's primary liaison with the H-2A workers, told the workers that CSI's Roxana Macias was a friend and Ms. Perez could tell CSI and other H-2A labor contractors not to give putative class members work in the future. *Sierra Decl.* at p. 6 ¶ 48-49. According to Ms. Sierra, this was not an idle threat, as some H-2A workers were sent back to Mexico because they questioned or disagreed with Ms. Perez. *Sierra Decl.* at p. 7 ¶ 51.

Munger's managers gave the same "go back to Mexico" response when workers made food complaints in California. *Rosas Decl.* at p. 5, ¶ 40; *Tapia Decl.* at p. 5, ¶ 39; *Worker Decls.* ¶¶ 33-35. The food Munger provided to workers in California was terrible (sometimes served with human hair or bugs in it) and workers had to force themselves to eat it. *Rosas Decl.* at p. 5, ¶ 38; *Tapia Decl.* at p. 5, ¶ 37; *Worker Decls.* ¶¶ 29-32. Some workers became ill from the food, and all spent personal funds to buy more food to avoid getting sick and fired. *Rosas Decl.* at p. 5, ¶¶ 41-44; *Tapia Decl.* at pp. 5-6, ¶¶ 40-43; *Worker Decls.* ¶¶ 32-39. Ms. Sierra, who ate the same food as putative class members, fell ill herself and refused to eat the food thereafter. *Sierra Decl.* at p. 8-9 ¶ 67-68.

**Washington Contracts**

In May of 2017, Sarbanand sought permission to transfer putative class members from Munger Bros. and Crowne Cold Storage to Sarbanand Farms in Sumas, Washington. *Morrison Decl., Ex 2.* at pp. 19 & 39, Dkt. # 18 at p. 9, ¶ 75. As part of that process, Sarbanand prepared two virtually identical H-2A contracts - one requesting 558 workers to start on July 10th, and the other for 60 workers to start work on July 20th. *Morrison Decl., Ex. 2* at pp. 14 & 34. Both

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 5

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA  98801
(509) 662-9681

1   contracts had the same end date, October 25, 2017, and both were signed by Cliff Woolley.

2   *Morrison Decl., Ex 2* at pp. 14, 19, 34 & 39. All putative class members were subject to one of

3   these virtually identical contracts.

4       Neither Sarbanand contract contained an hourly production standard. Instead, both

5   contracts stated, "Workers may work at a sustained, vigorous pace and make bona-fide efforts to

6   work efficiently and consistently that are reasonable under the climatic and all other working

7   conditions." *Morrison Decl., Ex. 2* at pp. 26 and 46. In terms of food, the contracts required

8   Sarbanand to provide three meals per day in exchange for "a deduction of $12.07 per day" from

9   the paychecks of all putative class members. *Morrison Decl., Ex. 2* at pp. 15 & 35. Sarbanand

10  was also obligated to provide housing for the workers under both contracts. *Morrison Decl., Ex.*

11  *2* at pp. 22 & 42.

12  **Common Threats and Intimidation Tactics at Sarbanand Farms in Washington**

13      When class members arrived in Washington, they were housed in a labor camp that was

14  enclosed by a fence and had a security guard who restricted access to Sarbanand's property.

15  *Rosas Decl.* at p. 6, ¶ 47; *Tapia Decl.* at p. 6, ¶ 46; *Worker Decls.* at ¶¶ 38-41. On the job site,

16  class members continued under the same managers as in California, including Defendant Nidia

17  Perez and Javier Sampedro. *Rosas Decl.* at p. 5, ¶ 45; *Tapia Decl.* at p. 6, ¶ 44; *Worker Decls.* at

18  ¶¶ 36-40. Sarbanand's managers continued the same practice of threatening to fire and blacklist

19  workers if they complained about poor working conditions. *Rosas Decl.* at p. 8, ¶ 73; *Tapia Decl.*

20  at p. 9, ¶ 72; *Worker Decls.* at ¶¶ 64-68.

21      On approximately July 3, 2017, Sarbanand held group meetings where all putative class

22  members were required to sign their Washington H-2A contracts. *Rosas Decl.* at p. 6, ¶ 48; *Tapia*

23  *Decl.* at p. 6, ¶ 47; *Worker Decls.* at ¶¶ 39-43. At that meeting, Ms. Perez told the workers they

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 6

had to be in the fields working every day and only people "on their death beds" were allowed to remain in their cabins. *Rosas Decl.* at p. 6, ¶ 49 *Tapia Decl.* at p. 6, ¶ 48; *Worker Decls.* at ¶¶ 40-44. Based on Ms. Perez's "death bed" speech, the workers believed they could not take a day off for injury or illness, which further reinforced the Grower Defendants' "para Mexico" intimidation policy. *Rosas Decl.* at p. 6, ¶¶ 50- 51; *Tapia Decl.* at p. 6, ¶¶ 49-50; *Worker Decls.* at ¶¶ 41-46.

Before work started, Sarbanand also instructed all workers that they had to pick two boxes of blueberries per hour (even though no such production standard existed in the contract) or they would receive written warnings. *Rosas Decl.*at p. 7, ¶ 56; *Tapia Decl.*at p. 7, ¶ 55; *Worker Decls.* at ¶¶ 47-51. If a worker received three warnings, they would be fired. *Id.* None of the workers had been advised when they were recruited, or at any other time before they arrived in Washington, that there would be a production standard at Sarbanand. *Id.*

Sarbanand pushed putative class members to work "extremely fast" to meet production standards during 12-hour shifts under hot and smoky conditions with no shade in the fields and inadequate water supplies. *Rosas Decl.* at pp. 6-7, ¶¶ 55-61; *Tapia Decl.* at pp. 7-8, ¶¶ 54-60; *Worker Decls.* at ¶¶ 46-56. During the harvest, Sarbanand held another group meeting where one of the owners and Mr. Hawk were present; Ms. Perez reiterated the two boxes per hour requirement and told everyone they were not picking fast enough. *Rosas Decl.*at p. 8, ¶ 70-71; *Tapia Decl.* at p. 8, ¶ 69-70; *Worker Decls.* at ¶¶ 61-66. After that meeting, Sarbanand managers again pushed workers in the field to pick two boxes an hour. *Rosas Decl.* at p. 8, ¶ 72; *Tapia Decl.* at p. 9, ¶ 71; *Worker Decls.* at ¶¶ 63-67.

As in California, the food in Washington was terrible and insufficient to meet the daily needs of the workers. The portions were uniformly meager, and Sarbanand instituted a marking

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 7

system, where all workers had to line up for food and a Sarbanand employee would mark their hand indicating they had received their one and only portion. *Rosas Decl.* at p. 7, ¶ 62-63; *Tapia Decl.* at p. 8, ¶¶ 61-62; *Worker Decls.* at ¶¶ 53-58. Sarbanand managers yelled and threatened to fire anyone who asked for more food. *Rosas Decl.* at p. 7, ¶ 63; *Tapia Decl.* at p. 8, ¶ 62; *Worker Decls.* at ¶¶ 54-58.

**Abuse of Laws and Common Fact Pattern for Termination and Eviction Subclass**

On August 2, 2017, an H-2A worker named Honesto Ibarra fell gravely ill and was taken to the emergency room, causing deep concern amongst the remaining workers about safety and health conditions at the farm. *Rosas Decl.* at pp. 8-9, ¶ 75-84; *Tapia Decl.* at pp. 9-10, ¶¶ 74-83; *Worker Decls.* at ¶¶ 67-79. On Friday, August 4th, approximately 70 H-2A workers went on a one-day strike to protect their own health and safety and get answers about what happened to Mr. Ibarra. *Rosas Decl.* at p. 9, ¶ 85; *Tapia Decl.* at p. 10, ¶ 84; *Worker Decls.* at ¶¶ 74-80. On Saturday morning, August 5th, all striking workers showed up ready to work. *Rosas Decl.* at p. 10, ¶ 89; *Tapia Decl.* at p. 10, ¶ 87; *Worker Decls.* at ¶¶ 78-84. Instead of allowing them to enter the fields, Mr. Hawk directed all H-2A workers to line up by crew and, one-by-one, called out the striking workers to report to the dining hall while non-strikers were sent into the fields. *Rosas Decl.* at p. 10, ¶ 90; *Tapia Decl.* at p. 10, ¶88; *Worker Decls.* at ¶¶ 78-85. Inside the meeting hall, Mr. Hawk summarily fired and evicted all striking workers for "insubordination" and gave them one hour to gather their belongings and leave the housing. *Rosas Decl.* at p. 10, ¶ 91; *Tapia Decl.* at p. 10, ¶ 89; *Worker Decls.* at ¶¶ 83-86[4]; *Morrison Decl., Ex. 7.* Sarbanand internally identified the reason for termination of these workers as "Protestor." *Morrison Decl., Ex. 8.* A Sarbanand employee video-recorded most, if not all of the meeting on her phone. *Rosas Decl.* at p. 10, ¶ 92;

---

[4] Except *Morrison Decl., Exs. 13, 21, 24-26, 28 & 32.*

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 8

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA  98801
(509) 662-9681

*Tapia Decl*. at p. 11, ¶ 90; *Worker Decls*. at ¶¶ 81-86.[5] When some of the workers refused to sign the paperwork, Ms. Perez threatened to call immigration and the police if they did not get out of the housing in one hour. *Rosas Decl*. at p. 10, ¶¶ 93-94; *Tapia Decl*. at p. 11, ¶¶ 91-92; *Worker Decls*. at ¶¶ 82-89.[6] None of the terminated workers believed they had the legal right to stay in the housing and so gathered their belongings to avoid being arrested. *Rosas Decl*. at p. 10, ¶¶ 96-97; *Tapia Decl*. at p. 11, ¶¶ 94-95; *Worker Decls*. at ¶¶ 85-93[7].

## III.   ARGUMENT

### A.   The Class and Subclass Should Be Certified under Rules 23(a) and 23(b)(3).

A class action must satisfy the requirements of Fed. R. Civ. P. 23(a) and at least one of the requirements of Fed. R. Civ. P. 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). As outlined below, Plaintiffs' class allegations meet all the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

### 1.   The Class Is So Numerous Joinder Is Impracticable.

Fed. R. Civ. P. 23(a)(1) requires plaintiffs to show the class is so numerous that joinder is impracticable. "[I]mpracticability does not mean impossibility; rather, the inquiry focuses on the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Est., Inc*., 329 F.2d 909, 913-14 (9th Cir. 1964). There is a presumption that any class of more than 40 individuals satisfies Rule 23(a)(1) on size alone. *See Jordan v. Los Angeles Cty.*, 669 F.2d 1311, 1319 (9th Cir.1982), *vacated on other grounds by Cty. of Los Angeles v. Jordan*, 459 U.S. 810 (1982).

---

[5] See footnote 4.
[6] See footnote 4.
[7] See footnote 4.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 9

The Grower Defendants employed over 600 H-2A workers to perform harvest labor for Munger in California and then transferred to Sarbanand's blueberry fields in 2017. Dkt. # 12 at p. 11, ¶ 96; p. 13-14, ¶¶ 116-19. Plaintiffs' TVPA, FLCA, WLAD, and contract claims are on behalf of all 600 workers in the proposed "H-2A Blueberry Harvester" class. For the Wrongful Termination subclass, Plaintiffs have identified approximately 70 workers who were fired and evicted on August 5, 2017. *Rosas Decl.* at p. 10, ¶¶ 90-92; *Tapia Decl.* at p. 10-11, ¶¶ 88-90. Plaintiffs have established numerosity for both the class and subclass.

> **2.    There Are Questions of Law or Fact Common to the Class and Common Questions Predominate.**

Because there is substantial overlap between the Rule 23(a)(2) commonality and the Rule 23(b)(3) predominance tests, *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010), Plaintiffs address both tests here to avoid repetitious legal and factual arguments.

Fed. R. Civ.P. 23(a)(2) requires that plaintiffs show "questions of law and fact common to the class." Under the rule, what matters is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (emphasis in original) (quoting *Dukes*, 564 U.S. at 350). "To satisfy Rule 23(a)(2) commonality, even a single common question will do." *Id.* (citations omitted). Whether a question will drive the resolution of the litigation depends on the nature and elements of the underlying class claims. *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165-66 (9th Cir. 2014) (holding that "[p]roving at trial whether such informal or unofficial policies existed" would drive the resolution of class claims).

Rule 23(b)(3) requires common questions to "predominate" over individualized questions. *See Wolin*, 617 F.3d at 1172. For purposes of this analysis, "a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 10

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA  98801
(509) 662-9681

issue is susceptible to generalized, class-wide proof.'" *Ruiz*, 835 F. 3d at 1134 (quoting *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "[M]ore important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Id.* Although Rule 23(a)(2) and Rule 23(b)(3) both address commonality, the 23(b)(3) test asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* As with the commonality test, the Court's inquiry begins with the elements of the asserted cause of action. *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 809 (2011).

    a)  <u>Blueberry Harvester Class</u>

The common and predominant questions for the Blueberry Harvester class are: 1) whether all Defendants were required to comply with the Washington Farm Labor Contractor Act, RCW 19.30; 2) whether the Grower Defendants had a common scheme or practice of threatening H-2A foreign workers in order to cause them to believe that they would suffer serious harm if they did not continue to perform labor for Sarbanand, in violation of 18 U.S.C. § 1589(a)(4) of the TVPA; 3) whether the Grower Defendants abused Washington's employment and housing laws in order to intimidate its foreign H-2A workers so they would continue working in violation of 18 U.S.C. §1589(a)(3) of the TVPA; 4) whether those same practices created a hostile working environment on the basis of national origin in violation of the Washington Law Against Discrimination, RCW 49.60.180(3); and, 5) whether there were contract violations related to imposition of undisclosed uniform production standards and the failure to provide adequate meals.

With respect to Plaintiff's FLCA claims, the common and predominant question is whether Defendants Nidia Perez or CSI were required to obtain a farm labor contractor license.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 11

RCW 19.30.020. FLCA defines a farm labor contractor as "any person, or his or her agent or subcontractor, who, for a fee, performs any farm labor contracting activity." RCW 19.30.010(5). "Farm labor contracting activity" includes any one of the following acts: "recruiting, soliciting, employing, supplying, transporting, or hiring agricultural employees." RCW 19.30.010(4). The question, then, is whether Ms. Perez or CSI recruited, solicited, employed, supplied, transported, or hired H-2A workers for a fee. Determining whether Ms. Perez or CSI qualify as farm labor contractors under FLCA is a common question that is susceptible to generalized, class-wide proof and will generate common answers to drive the resolution of the litigation.

Plaintiffs' TVPA and WLAD claims are also susceptible to generalized, class-wide proof apt to drive the resolution of the claims of the class. These claims rely on evidence of common practices and abuses that will be used to prove violations of both statutes.

Plaintiffs have pled two potential violations of the federal TVPA. The first, brought under 18 U.S.C. §1589(a)(4), requires Plaintiffs to prove that the Grower Defendants knowingly obtained labor by any scheme, plan, or pattern intended to cause class members to believe that if they did not perform such labor they would suffer serious harm. "[S]erious harm" is "any harm" that is "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. §1589(c)(2).

Plaintiffs' second TVPA claim is brought under 18 U.S.C. §1589(a)(3) and requires Plaintiffs to prove that the Growers knowingly obtained labor by abuse or threatened abuse of law or the legal process. Abuse or threatened abuse of law or legal process means "in any manner or for any purpose for which the law was not designed, in order to exert pressure on

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 12

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA 98801
(509) 662-9681

another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. §1589(c)(1).

The Ninth Circuit has held that threats to send someone back to their home country, by itself, can constitute serious harm under 18 U.S.C. §1589(a)(4). *See United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir., 2011) (repeated threats to send person back to Peru "could constitute serious harm to an immigrant who came to the United States in part to study English and who dreamed of starting a business"). These same threats may also constitute an abuse of the legal process under Section 1589(a)(3). *See Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1078 (E.D. Wash. 2013) (Judge Peterson, in denying employer's summary judgement on H-2A workers' TVPA claims under Section 1589(a), wrote, "Immigration laws . . . are not intended to help employers retain employees through threats of deportation.").

The case of *Mairi Nuñag-Tanedo v. East Baton Rouge Parish School Board* is instructive in terms of certifying class claims under the TVPA and the broad reach of that statute to protect workers from abusive working conditions. 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011). Plaintiffs were Filipino nationals who were recruited to work in the United States as teachers with H-1B visas. *Id.* at 1138. The teachers alleged that the defendants lied about requisite fees and expenses and threatened those who made complaints with deportation and legal action. *Id.* at 1139. In an initial ruling denying the defendants' motion to dismiss, the court emphasized its obligation to broadly interpret the TVPA to protect all types of trafficking victims:

> Congress has made it clear that forced labor and human trafficking also involve 'violations of other laws, including labor and immigration codes . . . .' H.R. Conf. Rep. 106-939, at 4 (2000). This shows the broad reach of the TVPA and the broad class of individuals whom it protects. Thus, it is the duty of this Court to provide a forum for the alleged victims of forced labor, regardless of the severity of the alleged circumstances.

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA  98801
(509) 662-9681

1   *Id.* at 1147. In a subsequent class certification ruling, the court ruled the plaintiffs met the

2   commonality prong under Rule 23(a)(2), stating the answers to the proposed questions (e.g.

3   "whether Defendants utilized threats of serious financial harm to compel Plaintiffs to work")

4   would determine "if plaintiffs were threatened with serious financial harm, an issue central to the

5   TVPA claims." *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. LA CV10-01172 JAK (MLGx),

6   2011 U.S. Dist. LEXIS 152329, at *17 (C.D. Cal. Dec. 12, 2011).

7          The court also found the plaintiffs met the predominance prong of Rule 23(b)(3) and

8   ruled the statute required it to first look at the defendant's intent in threatening harm. *Id.* at *20

9   ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was

10  threatened but that the employer intended the victim to believe that such harm would befall her."

11  (quoting *Dann*, 652 F.3d at 1170)). In determining whether the harm threatened was serious, the

12  court adopted a reasonable person test based on the statutory language of § 1589(c)(2): "Was the

13  threat sufficiently serious that a reasonable person of the same background and circumstances

14  would feel compelled to continue working?" *Id.* at *21 (citing *Dann* at 1170 ("According to the

15  statute, the threat, considered from the vantage point of a reasonable person in the place of the

16  victim, must be 'sufficiently serious' to compel that person to remain.")).

17         The court rejected the need for an individualized determination of harm, stating that

18  "[b]ecause the analysis of claimed TVPA inquiry will focus on the Defendants' intent with

19  respect to any threats made against Plaintiffs, and on a reasonable person's perception of those

20  threats, **the TVPA inquiry will not turn on, or require, individualized determinations**." *Id.* at

21  *21 (emphasis added). Finally, the court found that because class members shared a large

22  number of common attributes, same profession, same place of origin, being new to the U.S.,

23  working in the same place, and leaving their homes to work in a new country, "**they share the**

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 14

**'same background' and 'same circumstances,' allowing the fact-finder to use a common 'reasonable person' standard for all class members**." *Id*. at *22 (emphasis added).

More recently, the Tenth Circuit affirmed class certification and rejected defendant's arguments regarding predominance in a TVPA case alleging that detainees at a privately-run immigration detention center were forced to provide labor to the operator. *See Menocal v. The GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018). The Court found that predominance was satisfied by allegations that the operator "coerced [their] labor through a *uniform* policy" that subjected detainees who refused to comply to threats of various forms of discipline. *Id*. at 920.

Similarly, Plaintiffs here allege a common, uniform policy and practice of coercing labor through threats to return class members to Mexico and blacklist them from future H-2A work. This scheme was implemented through pronouncements in group meetings and consistent communications (and follow-up actions) to class members. Whether these threats violate the TVPA's prohibitions is a predominant question common to all class members.

Plaintiffs' WLAD claim likewise requires proof that Grower Defendants created a hostile work environment through an unfair practice of discriminating against the class in the terms or conditions of employment based on national origin. RCW 49.60.180(3). To establish a prima facie hostile work environment claim, plaintiffs must demonstrate that the harassment (1) was unwelcome, (2) was because of a protected characteristic, (3) affected the terms or conditions of employment, and (4) is imputable to the employer. *Blackburn v. Dep't of Soc. & Health Servs.*, 186 Wn.2d 250, 260 (2016). Plaintiffs only need to produce "evidence that supports a reasonable inference that [the] [protected class status] was the motivating factor for the harassing conduct." *Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 749-50 (2013) (defendant's use of the term "ghetto Hispanic" and suggesting that plaintiff did not "speak good English" implied racial and

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 15

ethnic motivations based on heritage). "[W]hether conduct was severe or pervasive enough to affect the terms and conditions of employment, depends on the totality of the circumstances, including the frequency and severity of harassing conduct, whether it was physically threatening or humiliating, or merely an offensive utterance, and whether it unreasonably interfered with the employee's work performance." *Id.* at 751. Harassment is imputed to an employer when an owner or manager personally participates in the harassment. *Glasgow v. Ga.-Pac. Corp.*, 103 Wn.2d 401, 407 (1985).

Here, the declarations of the Plaintiffs and Ms. Sierra demonstrate Plaintiffs' TVPA and WLAD claims are susceptible to generalized, class-wide proof to show a pattern or scheme of intimidation and hostile work environment. The class members are all Mexican citizens who were recruited to work in the United States from May to October 2017. In California, Munger's former employee, Ms. Sierra, confirms managers had a practice of responding to any complaints with: "Para Mexico." Ms. Sierra also overheard Ms. Perez threaten to blacklist the H-2A workers with her connections to labor contractors. Once in Washington, the workers continued under the same managers, including Ms. Perez. On July 3, 2017, Ms. Perez told the entire group of workers that only people "on their death beds" should be in their cabins. After work started, there was another group meeting where Ms. Perez told everyone they were not picking fast enough and reminded everyone to pick at least two boxes an hour. Sarbanand managers continued to threaten workers who asked questions or complained that they would be sent back to Mexico.

These threats were backed up by action that was publicly displayed to all class members. The Grower Defendants' repeated threats to send workers "para Mexico" was part of a common scheme meant compel the class to continue working under the belief that they would suffer

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 16

serious financial and reputational harm, which culminated in the immediate termination and eviction of a group of co-workers who dared to raise health and safety concerns at Sarbanand. In so doing, the Grower Defendants abused state employment and landlord-tenant laws by wrongfully terminating and evicting workers who legally engaged in concerted activity in order to intimidate and coerce class members to continue working. *See infra* Part 2.b at 19-21. This practice of threatening to send workers back to their home country for any work condition complaints also constitutes discrimination based on national origin. Whether the universal treatment of the class, under uniform conditions, constitute violations of the TVPA and WLAD pose common and predominant questions with common answers applicable to each member of the class.

Finally, with respect to their breach of contract claims, Plaintiffs allege that the Grower Defendants violated the H-2A contract by imposing previously undisclosed production standards and by serving the class uniform, meager meals. In Washington, workers were told they had to pick two boxes of blueberries per hour or receive written warnings, with three warnings resulting in termination and being sent back to Mexico. Sarbanand's 2017 Clearance Order did not contain hourly production standards; instead, it stated, "Workers may work at a sustained, vigorous pace and make bona-fide efforts to work efficiently and consistently that are reasonable under the climatic and all other working conditions." *Morrison Decl., Ex. 2* at pp. 26 & 46. For meals, Sarbanand was obligated under the contract to supply three meals per day and deducted $12.07 daily from each worker's pay in exchange. However, the supplied portions were tiny and substandard in quality, and Sarbanand resorted to a marking system, where workers had to line up for food and get a mark on their hand to prevent them from seeking more than one serving. Anyone requesting more food was yelled at or threatened with termination. All class members

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA 98801
(509) 662-9681

worked under the same clearance orders, in the same location, for the same employer, and received meals from the same source. Thus, these claims are susceptible to class treatment due to Defendants' uniform practices and conditions.

In sum, the Blueberry Harvester Class poses common questions, the answers to which will drive the resolution of Plaintiffs' claims: 1) whether Ms. Perez and CSI were required to be licensed under FLCA, RCW 19.30; 2) whether Sarbanand and Munger engaged in common practices or schemes that violated the TVPA and the WLAD; and 3) whether common practices of Sarbanand and Munger breached the H-2A contract provisions related to production standards and meals. Because these questions predominate across the class, adjudication of these claims on a class basis is appropriate.

    b) <u>Wrongful Termination Subclass</u>

There are two common and predominant questions for the Wrongful Termination subclass: (1) whether the mass termination on August 5, 2017 under threat of arrest by police or immigration authorities amounted to a wrongful termination for engaging in concerted activity in violation of RCW 49.32.020; and (2) whether the summary eviction on that date violated Washington's landlord-tenant laws.

Plaintiffs allege that Defendants Munger and Sarbanand interfered with the workers' protected activities by terminating their employment in retaliation for holding a one-day strike. RCW 49.32.020 declares the public policy of the state of Washington that workers shall be free from "interference, restraint, or coercion of employers of labor, or their agents" in "concerted activities for the purpose of collective bargaining or other mutual aid or protections." *See, e.g., Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 755-56 (1995) (farm worker strike to improve working conditions amounted to concerted activity protected under the statute). Subclass members were

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 18

all fired at the same time and were provided with identical "Employee Separation Notice" and "Termination" forms, where the "complete details about the separation" are described as "Terminate-Protestor." Whether Grower Defendants' conduct amounts to unlawful termination is a common question that is susceptible to generalized, class-wide proof and apt to drive the resolution of the claim for the subclass.

Plaintiffs also allege that Grower Defendants' conduct resulted in the unlawful eviction of members of the subclass when they threatened to call law enforcement and immigration authorities if all terminated workers did not vacate the housing within one hour. Self-help evictions are against public policy. *See Spencer v. Commercial Co.*, 30 Wash. 520, 525-26 (1902) (landlord's common law remedy was replaced by statute which "provide[s] a speedy, adequate, and orderly method for a landlord to obtain possession"). A person is liable for forcible entry when they enter upon any real property by fraud, intimidation, or "circumstance of terror," or "after entering peacefully…turns out by force, threats or menacing conduct the party in actual possession." RCW 59.12.010. Whether Defendants' conduct amounts to an unlawful eviction is a common question that will drive the resolution of the claim for the subclass.

Because all Wrongful Termination subclass members were treated identically, and because proof of common treatment resides in Sarbanand's own video recordings, common questions predominate as to the subclass.

### 3. The Claims of the Class Representatives Are Typical of the Class.

Fed. R. Civ. P. 23(a)(3) requires that the claims or defenses of the named representatives be typical of the claims or defenses of the class to ensure those interests are aligned. Typicality is met if the representative plaintiffs' claims arise from the same practice or course of conduct as those of the class members. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011); *see also Ruiz*,

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 19

835 F.3d at 1141-42 (disclosure and recruitment practices sufficiently typical of class of farm workers). Measures of typicality include "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ruiz*, 835 F.3d at 1141 (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Here, Plaintiffs Rosas and Tapia both went to CSI offices in Mexico and were not provided with proof of contractor's license. On approximately July 3, 2017, both were present at group meetings and told that they needed to be on their death beds to take a day off. Both Plaintiffs were repeatedly told that they would need to pick two boxes of blueberries per hour. Both Plaintiffs were served with insufficient, meager meals while working in Washington. Finally, both Plaintiffs were made into disciplinary examples when Sarbanand terminated and evicted them. Thus, the Plaintiffs' claims arise from the Defendants' alleged common course of conduct and are typical of those of the proposed Blueberry Harvester class.

Plaintiffs Rosas and Tapia are similarly situated to the members of the proposed Wrongful Termination subclass because they were among the approximately 70 workers who went on strike and were summarily terminated and evicted. Because the action is based on Munger and Sarbanand's course of conduct which is not unique to the named Plaintiffs and resulted in the same or similar injuries to all subclass members, the class representatives' claims meet the "typicality" requirement of Fed. R. Civ. P. 23(a)(3).

### 4.      The Representative Parties Will Adequately Protect the Class.

The final prerequisite, Fed. R. Civ. P. 23(a)(4), requires the resolution of two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 20

and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted).

There is no evidence of conflicts between the class representatives or counsel and the proposed class. Plaintiffs Rosas and Tapia understand the claims in the case and the need to think and act on behalf of class members, as well as follow the orders of this Court. *Rosas Decl.* at p. 2, ¶¶ 5-8; *Tapia Decl.* at p. 2, ¶¶ 5-8. Plaintiffs' attorneys have lengthy track records representing workers in class action litigation and will vigorously prosecute the action on behalf of the class. *Decls. Morrison* and *Berger*. The class representatives and counsel will fairly and adequately protect the interests of the class.

### 5.     The Remaining Criteria of Fed. R. Civ. P. 23(b)(3) Are Also Satisfied.

Plaintiffs also meet the superiority requirement of Rule 23(b)(3). The Court considers the following factors in determining whether a class action is the superior means of adjudicating the dispute:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class.

Fed. R. Civ. P. 23(b)(3).

With respect to the first factor, there is no evidence or reason to believe that any of the members of the proposed class have a strong interest in initiating and independently controlling their own individual actions. *See Saucedo v. NW Mgmt. and Realty Servs., Inc.*, 290 F.R.D. 671, 685 (E.D. Wash. 2013); *see also Rodriguez v. Carlson*, 166 F.R.D. 465, 479 (E.D. Wash. 1996). Given their limited English skills, financial resources, and understanding of the legal system, as well as primary residence in a foreign country, it is unlikely that individual class members would pursue

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 21

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA  98801
(509) 662-9681

1    these claims absent class certification. *See id.* at 480; *Leyva v. Buley*, 125 F.R.D. 512, 518 (E.D.

2    Wash. 1989).

3         As to the second and third factors, there is presently no other litigation regarding this

4    controversy commenced by members of the class, and it is in the interests of all parties to

5    concentrate the litigation in the Western District of Washington.

6         As to the final element, there do not appear to be any substantial difficulties in managing this

7    particular class action. Courts recognize that FLCA statutory damages are not dependent on proof of

8    actual injury because in the event that actual damages are difficult or impossible to measure or

9    prove, courts may award statutory damages of $500 per person, per violation under RCW

10   19.30.170(2). *Perez-Farias v. Glob. Horizons, Inc.*, 175 Wn.2d 518, 530 (2012). Moreover, any

11   difficulties that may arise in adjudication of the action due to language barriers or the geographic

12   location of the class members would be exacerbated by the pursuit of multiple individual claims,

13   rather than a class action.

14   **B.      Plaintiffs' Claim for Injunctive Relief Should Be Certified under Rule 23(b)(2).**

15        Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on

16   grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory

17   relief is appropriate respecting the class as a whole." For a class to be certified under Rule

18   23(b)(2), "[i]t is sufficient if class members complain of a pattern or practice that is generally

19   applicable to the class as a whole[,] [e]ven if some class members have not been injured by the

20   challenged practice." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). These requirements

21   are "unquestionably satisfied when members of a putative class seek uniform injunctive or

22   declaratory relief from policies or practices that are generally applicable to the class as a whole."

23   *Parsons v. Ryan*, 754 F.3d 657, 688-89 (9th Cir. 2014).

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 22

Here, the Grower Defendants' alleged treatment of the class and subclass, if proven at trial, merits injunctive relief on a class-wide basis. Plaintiffs' requested injunctive relief would require Grower Defendants to refrain from: threatening workers with deportation; imposing unlawful production standards; discouraging complaints on work conditions and injuries; refrain from evicting workers from supplied housing under threat of arrest; and inform all H-2A workers that evictions can only occur after due notice, a court hearing, and a neutral judge signs a court order. Dkt. # 12, at p. 34, ¶¶ 4-9. Moreover, this prospective relief is warranted whether or not damages are awarded to Plaintiffs or the class for Defendants' past conduct. Class certification under 23(b)(2) is appropriate on the claims for injunctive relief because they arise from Defendants' conduct toward the class as a whole and the requested injunctive relief is generally applicable to all members of the class.

## C.   The Court Should Appoint Plaintiffs' Attorneys as Class Counsel.

In appointing class counsel under Fed. R. Civ P. 23(g)(1), the Court must consider the following: the work counsel has done in identifying and investigating potential claims; counsel's experience in handling class actions, complex litigation, and claims of the type asserted; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class. Here, counsel have experience handling class actions, including claims similar to those asserted here, and extensive knowledge of the applicable law. *See generally Decls. Morrison* and *Berger*. And counsel have committed to expend the resources necessary to represent the class. *Morrison Decl.* at p. 4, ¶9.

## IV.   CONCLUSION

Plaintiffs respectfully submit they have satisfied all the requirements of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). This Court should grant Plaintiffs' Motion for Class Certification,

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 23

1  approve Plaintiffs Barbaro Rosas and Guadalupe Tapia as class representatives, appoint

2  Plaintiffs' counsel to represent the class and subclass, and direct the parties to confer on class

3  notice and a notice plan.

4  DATED this 7th day of September 2018.

5  By: s/ Joachim Morrison                         By: s/ Bernardo Cruz
   By: s/ Tony Gonzalez                            By: s/ Lori Jordan Isley
6      Joachim Morrison, WSBA# 23094                  Lori Jordan Isley, WSBA #21724
       Tony Gonzalez, WSBA #47771                     Bernardo Cruz, WSBA #51382
7      COLUMBIA LEGAL SERVICES                        COLUMBIA LEGAL SERVICES
       300 Okanogan Avenue, Suite 2A                  6 South Second Street, Suite 600
8      Wenatchee, WA 98801                            Yakima, WA 98901
       (509) 662-9681                                 (509) 575-5593
9      Email: joe.morrison@columbialegal.org          Email: lori.isley@columbialegal.org
              tony.gonzalez@columbialegal.org                bernardo.cruz@columbialegal.org
10     *Attorneys for Plaintiffs*                     *Attorneys for Plaintiffs*

11  By: s/ Adam Berger
    By: s/ Lindsay Halm
12     Adam Berger, WSBA# 20714
       Lindsay Halm, WSBA# 37141
13     SCHROETER GOLDMARK & BENDER
       810 Third Avenue, Suite 500
14     Seattle, Washington 98104
       (206) 622-8000
15     Email: berger@sgb-law.com
              halm@sgb-law.com
16     *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 24

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of September, 2018, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to the following:

| | |
|---|---|
| Derek Bishop | dbishop@grsm.com |
| Christopher E. Hawk | chawk@grsm.com |
| Adam S. Belzberg | adam.belzberg@stoel.com |
| Christopher T. Wall | christopher.wall@stoel.com |
| Ryan R. Jones | ryan.jones@stoel.com |
| Adam J. Berger | berger@sgb-law.com; cronan@sb-law.com; molina@sgb-law.com; oneil@sgb-law.com; whalen@sgb-law.com |
| Lindsay Halm | halm@sgb-law.com |
| Bernardo Cruz | Bernardo.cruz@columbialegal.org; elvia.bueno@columbialegal.org; cheli.bueno@columbialegal.org |
| Tony Gonzalez | tony.gonzalez@columbialegal.org; ivy.rosa@columbialegal.org |
| Lori Isley | lori.isley@columbialegal.org; rachael.pashkowski@columbialegal.org |
| Joachim Morrison | joe.morrison@columbialegal.org; rachael.pashkowski@columbialegal.org |

And I hereby certify that I have mailed by United States Postal Service the document to

the following non-CM/ECF participants: None.

Rachael Pashkowski

Columbia Legal Services
300 Okanogan Avenue, Suite 2A
Wenatchee, WA  98801
(509) 662-9681