1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10

BARBARO ROSAS and GUADALUPE
TAPIA, as individuals and on behalf of all
other similarly situated persons,

CASE NO. C18-0112-JCC

ORDER

11
12

                    Plaintiffs,

            v.

13
14

SARBANAND FARMS, LLC, MUNGER
BROS., LLC, NIDIA PEREZ, and CSI VISA
PROCESSING S.C.,

15
16

                    Defendants.

17
18
19

        This matter comes before the Court on Plaintiffs' motion to certify class (Dkt. No. 57).

Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral

argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

20

I.      BACKGROUND

21
22

        Defendants Sarbanand Farms, LLC and Munger Bros., LLC (collectively, "Growers") are

separate companies who share common owners. (Dkt. No. 11.) In 2017, Defendant Nidia Perez

23
24

was employed by Growers and was involved with Growers' hiring of workers through the H-2A

25
26

visa program for the 2017 harvesting season. (Dkt. Nos. 12 at 3, 8; 18 at 3; 19 at 3.)[1] Robert Hawk is the Chief Executive Officer of Defendant Munger Bros. (Dkt. No. 68 at 1.) Cliff Woolley serves as Defendant Sarbanand Farms' Chief Administrative Officer. (Dkt. No. 18 at 13.) Plaintiffs Barbaro Rosas and Guadalupe Tapia are Mexican nationals who worked for Growers as foreign H-2A agricultural workers during the 2017 harvesting season, and bring this action on behalf of a proposed class and subclass of other Mexican nationals who worked for Growers in Sumas, Washington during the 2017 harvesting season. (Dkt. Nos. 12, 57 at 2.)

In 2017, after employing Mexican nationals through the H-2A visa program in 2015 and 2016, Growers wished to expand their use of foreign workers to farms in California, and hired Giovanna Sierra and Defendant CSI Visa Processing S.C. ("CSI") to assist in the process. (Dkt. Nos. 58 at 2, 68 at 2–3.) Defendant CSI is a Mexican corporation, and was retained to recruit workers in Mexico. (Dkt. Nos. 18 at 3, 10; 19 at 3, 10.) One of Defendant Perez's primary contacts at Defendant CSI was Roxana Marcias, its Director of Compliance. (Dkt. Nos. 12 at 10, 31 at 8.) Neither Defendant Perez nor Defendant CSI are licensed or bonded by Washington to operate as a farm labor contractor. (Dkt. Nos. 12 at 10–11, 31 at 8.)

Growers obtained clearance from the U.S. Department of Labor (the "Department") to hire approximately 600 workers from Mexico through the H-2A visa program through two contracts. (*See* Dkt. Nos. 61-2, 61-3.) In March 2017, Defendant Munger Bros. obtained clearance from the Department to employ 387 H2-A workers in California. (Dkt. Nos. 61-3, 68 at 3.)[2] The California H-2A contract ran from May 15 to June 30, 2017. (Dkt. No. 61-3.) Putative

---

[1] The H-2A visa program "allows agricultural employers to obtain visas for foreign workers to work in the United States if there are not enough domestic workers to fill the labor needs of the farm." (Dkt. No. 58 at 2.)

[2] Crowne Cold Storage, LLC, another company owned by or associated with the owners of Growers, submitted two applications to hire 111 and 60 workers for work in California from May 15 to June 30, 2017. (Dkt. No. 61-4.) Crowne Cold Storage, LLC is not a named party to this action, but some of the workers it hired are members of the proposed class of workers who worked for Defendant Sarbanand Farms in Washington. (*See* Dkt. No. 57 at 3.)

class members were hired through Defendant CSI after being contacted by Defendant Perez or a recruiter employed by Defendant CSI. (Dkt. Nos. 59 at 3, 60 at 3; *see generally* Dkt. Nos. 61-9–61-32.)[3] Class members were not shown a Washington farm labor contractor license or proof of bonding. (Dkt. Nos. 59 at 4, 60 at 4; *see generally* Class Decls.)

Plaintiffs allege that the H-2A workers hired to work for Defendant Munger Bros. in California were subjected to threatening responses to work- or food-related complaints. For example, managers would tell workers to "go back to Mexico," which the workers interpreted as a threat that they would be fired, forced to return to Mexico using their own funds, and prohibited from working in the United States in the future. (Dkt. Nos. 58 at 5, 59 at 4–5, 60 at 4–5; *see generally* Class Decls.) Several workers became ill from the food provided by Defendant Munger Bros., and spent personal funds to purchase additional food to avoid becoming sick. (Dkt. Nos. 59 at 5, 60 at 5; *see generally* Class Decls.) Ms. Sierra also became sick after eating food being served to the workers. (Dkt. No. 58 at 8–9.) In addition, Defendant Perez threatened the workers that they would be sent back to Mexico if they did not work hard, and that she would tell Ms. Macias and Defendant CSI to not hire them in the future. (Dkt. No. 58 at 6–7.) Several workers who questioned or disagreed with Defendant Perez were sent back to Mexico and were not transferred to Washington after the conclusion of the California contract. (*Id.* at 7.)

Following the completion of their work in California, the workers were offered a choice of returning to Mexico or traveling to Sumas, Washington to assist with blueberry harvesting for Defendant Sarbanand Farms. (Dkt. No. 68 at 3.) Defendant Sarbanand Farms obtained clearance from the Department to hire workers on H-2A visas to work in Sumas, Washington through two contracts (the "H-2A contracts"): one requested 558 workers beginning on July 10, 2017 and the

---

[3] Plaintiffs have filed numerous declarations of putative class members and cite them collectively in their motion for class certification. (*See* Dkt. No. 57 at 4; *see generally* Dkt. Nos. 61-9–61-32). Plaintiffs cited to these declarations alternatively as "*Class Decls*" or "*Worker Decls*." (*See* Dkt. No. 57 at 4 (using "Class Decls"), *cf.* 5 (using "*Worker Decls*.")) The Court will adopt Plaintiffs' citation convention and refer to these declarations collectively as "Class Decls." where relevant.

other requested 60 workers beginning on July 20, 2017. (Dkt. No. 61-2 at 2, 22.) Both H-2A contracts anticipated that the periods of employment would conclude on October 25, 2017. (*Id.*) Both stated that the workers would be required to work at a sustained and vigorous pace, and would be required to make bona fide efforts to work efficiently and consistently. (*Id.* at 14, 34.) The H-2A contracts also stated that Defendant Sarbanand Farms would provide workers with three meals a day in exchange for deducting $12.07 per day from their paychecks, and obligated Defendant Sarbanand Farms to provide housing. (*Id.* at 3, 10, 23, 30.) All putative class members were subject to one of the H-2A contracts. (Dkt. No. 57 at 6.)

When putative class members arrived in Sumas, Washington, they were housed in dormitories enclosed by a fence, and a security guard restricted access to Defendant Sarbanand Farms' property. (Dkt. Nos. 59 at 6, 60 at 6; *see generally* Class Decls.) On or around July 3, 2017, Defendant Sarbanand Farms held meetings where the putative class members signed their H-2A forms. (Dkt. Nos. 59 at 6, 60 at 6; *see generally* Class Decls.) At the meeting, Defendant Perez stated that the putative class members were expected to work every day, and only those "on their death beds" could remain in their housing; putative class members interpreted this to mean that they could not take a day off for injury or illness. (Dkt. Nos. 59 at 6, 60 at 6; *see generally* Class Decls.) Prior to starting work, putative class members were told that they would have to pick two boxes of blueberries per hour, and would receive written warnings if they failed to do so. (Dkt. Nos. 59 at 7, 60 at 7; *see generally* Class Decls.) Putative class members worked under the same managers as in California, including Defendant Perez, and were subjected to the same threats that they could be terminated and sent back to Mexico if they complained or received three written warnings. (Dkt. Nos. 59 at 6–8, 60 at 6–9; *see generally* Class Decls.)

Putative class members worked under harsh conditions in the fields, and were repeatedly told that they needed to work faster. (*See* Dkt. Nos. 59 at 6–7, 60 at 7–8; *see generally* Class Decls.) Plaintiffs allege that the food provided by Defendant Sarbanand Farms was of poor quality, and that putative class members were not given sufficient amounts to meet their daily

needs. (Dkt. Nos. 59 at 7, 60 at 8; *see generally* Class Decls.)

On August 2, 2017, Honesto Ibarra, one of the H-2A workers, fell ill. (Dkt. No. 68 at 4.) Mr. Ibarra was taken to a hospital and eventually passed away. (*Id*.) On August 4, approximately 60 putative class members refused to appear for work. (*Id*.) The striking class members refused to work in order to protest the poor work conditions and to obtain information about what happened to Mr. Ibarra. (Dkt. Nos. 59 at 9, 60 at 10; *see generally* Class Decls.) On August 5, the striking class members reported for work but were separated from the other H-2A workers by Mr. Hawk and told to gather in the dining hall. (Dkt. Nos. 59 at 10, 60 at 10; *see generally* Class Decls.) Mr. Hawk told the gathered striking class members that they were fired for insubordination, and that they had to leave Defendant Sarbanand Farms' housing within an hour. (Dkt. Nos. 59 at 9, 60 at 10, 61-8; *see generally* Class Decls.)[4] When the striking class members refused to sign paperwork, Defendant Perez became angry and threatened to call the police and immigration officials. (Dkt. Nos. 59 at 10, 60 at 11; *see generally* Class Decls.) The striking class members, believing that they did not have a legal right to remain in the housing, left the housing and were not given their final paychecks. (Dkt. Nos. 59 at 9, 60 at 10; *see generally* Class Decls.) Many did not have sufficient funds to immediately return to Mexico. (Dkt. Nos. 59 at 9, 60 at 10; *see generally* Class Decls.) The remaining putative class members continued to work until October 3, 2017, after which they returned to Mexico. (Dkt. No. 68 at 4.)

Plaintiffs now move for certification of a proposed class and subclass. (Dkt. No. 57.) Plaintiffs propose a 2017 H-2A Blueberry Harvester Class, defined as, "All Mexican nationals who worked at Sarbanand Farms, LLC in Sumas, Washington picking blueberries pursuant to an H-2A contract that offered employment from July 2017 through October 2017." (Dkt. No. 57 at 1–2.) The proposed 2017 H-2A Blueberry Harvester Class alleges that all Defendants violated the Washington Farm Labor Contractor Act ("FLCA"), Wash. Rev. Code § 19.30, for using

---

[4] Documents show that Defendant Sarbanand Farms terminated Plaintiffs Rosas and Tapia as "Protester[s]." (Dkt. No. 61-7.)

unlicensed farm labor contractors to recruit members of the class. (Dkt. No. 57 at 2.) The proposed 2017 H-2A Blueberry Harvester Class also alleges that Growers violated the federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, violated Washington's Law Against Discrimination ("WLAD"), Wash. Rev. Code. § 49.60.180(3), and breached the H-2A contracts between the parties. (Dkt. No. 1 at 23–25; Dkt. No. 57 at 2.)

Plaintiffs also propose a Wrongful Termination Subclass, defined as "approximately 70 H-2A workers who were terminated and evicted from Sarbanand Farms for protesting dangerous working conditions." (Dkt. No. 57 at 2.) The proposed Wrongful Termination Subclass alleges that Growers violated Washington's Little Norris-LaGuardia Act ("WLNL"), Wash. Rev. Code § 49.32.020, and violated Washington's employment and landlord-tenant laws by improperly discharging and evicting the subclass members. (*Id.*; *see also* Dkt. No. 1 at 25–26.)

## II. DISCUSSION

### A. Legal Standard for Class Certification

A party seeking to litigate a claim as a class representative must affirmatively satisfy the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Federal Rule of Civil Procedure 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011); *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). In determining whether Plaintiffs have carried their burden, the Court must conduct a "rigorous analysis." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). A district court must not decide the merits of a factual or legal dispute before it grants class certification. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974); *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 808–09 (9th Cir. 2010). But a district court "*must* consider the merits [of class members' substantive claims] if they overlap with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). The ultimate decision to certify a class is within the Court's discretion. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir.

2009).

**B.      Rule 23(a) Requirements**

Rule 23(a) states that one or more members of a class may sue as a representative plaintiff only if (1) the class is so numerous that joinder is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of representative parties are typical of those of the class; and (4) the representatives will fairly and adequately protect the interests of the absent class members. Fed. R. Civ. P. 23(a); *Mazza*, 666 F.3d at 588 ("Rule 23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality and adequacy of representation in order to maintain a class action.").

1.      Numerosity

Rule 23(a)'s first requirement is satisfied when the proposed class is sufficiently numerous to make joinder of all members impracticable. Fed. R. Civ. P. 23(a)(1). A numerosity determination requires an examination of the specific facts of each case, though "[i]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010). Plaintiffs assert that there are 600 members of the H-2A Blueberry Harvester Class and 70 members of the Wrongful Termination Subclass. (Dkt. No. 57 at 10.) Defendants agree that both the class and subclass, if certified, would satisfy the numerosity requirement. (*See* Dkt. No. 67 at 10.) Therefore, the Court finds that numerosity is satisfied as to both the H-2A Blueberry Harvester Class and the Wrongful Termination Subclass.

2.      Commonality

Under Rule 23(a)(2)'s commonality requirement, Plaintiffs must demonstrate that the "class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.'" *Mazza*, 666 F.3d at 588 (quoting *Dukes*, 564 U.S. at 350). The key inquiry is not whether Plaintiffs have raised common questions, but whether "class treatment will 'generate common *answers* apt to

drive the resolution of the litigation.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 350). Every question of law or fact need not be common to the class. *Id.* Rather, all Rule 23(a)(2) requires is "a single *significant* question of law or fact." *Id.* Ultimately, the existence of "shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).

### a. *2017 Blueberry Harvester Class*

### i. **FLCA Claim**

"No person shall act as a farm labor contractor until a license to do so has been issued to him or her by the director, and unless such license is in full force and effect and is in the contractor's possession." Wash. Rev. Code § 19.30.020. A farm labor contractor is "any person, or his or her agent or subcontractor, who, for a fee, performs any farm labor contracting activity." Wash. Rev. Code § 19.30.010(5). "'Farm labor contracting activity' means recruiting, soliciting, employing, supplying, transporting, or hiring agricultural employees." Wash. Rev. Code § 19.30.010(4).

Plaintiffs assert that putative class members were recruited by recruiters employed by Defendant CSI, who did not show them a labor contractor license or inform them that Defendant CSI had a bond. (*See* Dkt. Nos. 59 at 4, 60 at 4; *see generally* Class Decls.)[5] Defendants do not contend that the question of whether Defendant CSI's recruiters improperly recruited putative class members is not common to the 2017 Blueberry Harvester Class. (*See* Dkt. No. 67 at 12–

---

[5] In their complaint, Plaintiffs allege that Defendants CSI and Perez violated the FLCA when they failed obtain a farm labor contractor license prior to recruiting Plaintiffs and satisfy other obligations under the FLCA, and that Growers violated the FLCA when they knowingly used the services of an unlicensed farm labor contractor. (Dkt. No. 12 at 31–32.)

14.) The Court finds that a common question regarding whether Defendant CSI's recruiters possessed a farm labor contractor license while engaging in farm labor contracting activity exists as to the 2017 Blueberry Harvester Class.

Plaintiffs argue that a common question exists as to Defendant Perez's liability under the FLCA because she admits that she transmitted a list of potential visa applicants for work at Defendant Sarbanand Farms in 2017 to Defendant CSI, which included workers who had previously worked for Defendant Sarbanand Farms in 2015 or 2016. (Dkt. Nos. 64 at 8–9, 71 at 7.)[6] This common question raises issues regarding whether Defendant Perez's transmission of the list to Defendant CSI constituted farm labor contracting activity, and whether Defendant Perez did not hold the necessary license when she did so. *See* Wash. Rev. Code § 19.30.020, 19.30.010(4)–(5). These issues are only common to putative class members who appeared on Defendant Perez's list, and therefore may have been improperly recruited or solicited; for example, several putative class members did not work for Growers in 2015 or 2016, but were recommended by family members. (*See* Dkt. Nos. 61-11 at 4, 61-12 at 4, 61-13 at 4). Therefore, the Court finds that the common question of whether Defendant Perez violated the FLCA is only applicable to those members of the 2017 Blueberry Harvester Class who appeared on the list sent by Defendant Perez to Defendant CSI (the "2017 Blueberry Harvester Class – Defendant Perez Subclass").

### ii.    TVPA Claims

The TVPA prohibits a person from obtaining labor or services through "abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(3). The TVPA defines an "abuse or threatened abuse of law or legal process" as the use or threatened use of such law or legal

---

[6] Only a few of the numerous declarations submitted by Plaintiffs detail direct involvement by Defendant Perez in the recruitment process, and those declarations do not present a uniform factual scenario. (*See* Dkt. Nos. 61-10 at 4, 61-15 at 4, 61-16 at 4, 61-26 at 4, 61-30 at 4.) These unique claims are not amenable to class certification, and Plaintiffs must bring such claims against Defendant Perez individually. *See Mazza*, 666 F.3d at 588

process "in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

The TVPA also prohibits a person from providing or obtaining labor or services through use of "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(4). The TVPA defines "serious harm" as "any harm, whether physical or nonphysical[,] . . . that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

Plaintiffs assert that a common question exists as to whether Growers violated the TVPA when they compelled putative class members to continue to work through a variety of threats, including implied threats that they would be sent back to Mexico if they complained or did not meet Growers' production standard. (Dkt. Nos. 59 at 7–8, 60 at 9; *see generally* Class Decls.) Defendants' arguments in response focus on whether individualized issues predominate over class-wide issues, discussed further below. (*See* Dkt. No. 67 at 14–16.) Therefore, the Court finds that common questions exist regarding whether Growers obtained labor or services from the 2017 Blueberry Harvester Class in violation of 18 U.S.C. § 1589(a)(3) and 18 U.S.C. § 1589(a)(4).

### iii.    WLAD Claim

Employers are prohibited from discriminating against a person in their terms or conditions of employment based on race or national origin. Wash. Rev. Code § 49.60.180(3). To establish a hostile work environment claim, the plaintiff must establish that the alleged harassment "(1) was unwelcome, (2) was because of a protected characteristic, (3) affected the terms or conditions of employment, and (4) is imputable to the employer." *Blackburn v. State*

*Dep't of Soc. & Health Servs.*, 375 P.3d 1076, 1081 (Wash. 2016).

Plaintiffs allege that Growers created a hostile work environment in violation of Revised Code of Washington § 49.60.180(3) when they engaged in a "practice of threatening to send workers back to their home country for any work condition complaints." (Dkt. No. 57 at 17.) Defendants' arguments in response focus on whether individualized issues, particularly whether individual putative class members heard the alleged threats and interpreted them as threats, predominate over class-wide issues. (*See* Dkt. No. 67 at 17–18.) Therefore, the Court finds that a common question regarding whether Growers violated the WLAD exists as to the 2017 Blueberry Harvester Class.

### iv.    Breach of Contract Claims

In this case, Defendant Sarbanand Farms' H-2A contracts provided that, "Workers may work at a sustained, vigorous pace and make bona-fide efforts to work efficiency and consistently that are reasonable under the climatic and all other working conditions." (Dkt. No. 61-2 at 14, 46.) The H-2A contracts further provided that Defendant Sarbanand Farms would provide putative class members with three meals per day in exchange for deducting $12.07 per day from their paychecks. (*Id.* at 15, 35.) When putative class members arrived in Washington to work for Defendant Sarbanand Farms, they were informed that they were required to pick two boxes of blueberries an hour. (Dkt. Nos. 59 at 7, 60 at 7; *see generally* Class Decls.) They also were provided with low-quality food in quantities insufficient to meet their daily needs. (Dkt. Nos. 59 at 7, 60 at 8; *see generally* Class Decls.) Plaintiffs assert that a common question regarding whether Growers breached the H-2A contracts by imposing a previously undisclosed production standard and providing low quality food in insufficient quantities exists as to the 2017 Blueberry Harvester Class. (Dkt. No. 57 at 17.) Defendants' arguments in response focus on whether issues of individual putative class members' subjective interpretation and understanding of the H-2A contracts predominate over this common question. (*See* Dkt. No. 67 at 18–20.) Therefore, the Court finds that a common question regarding whether Growers breached the H-

2A contracts by imposing a new production standard and by providing low-quality food in insufficient quantities exists as to the 2017 Blueberry Harvester Class.

### b. Wrongful Termination Subclass

#### i. Termination for Engaging in Protected Activities Claim

Under Washington law, employers are prohibited from interfering with, restraining, or coercing labor employees engaging "in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections." Wash. Rev. Code § 49.32.020. The concerted activities must relate to the terms and conditions of employment or be seeking improved working conditions. *Briggs v. Nova Servs.*, 213 P.3d 910, 915 (Wash. 2009). "[T]he term 'concerted activities' encompasses the collective action of non-unionized employees." *Bravo v. Dolsen Cos.*, 888 P.2d 147, 149 (Wash. 1995) (analyzing farm worker plaintiffs' argument that defendant employer violated Revised Code of Washington sections 49.32.020 when it terminated them for participating in strike for better working conditions).

Plaintiffs assert that a common question exists as to whether Growers violated Washington employment law when they terminated the Wrongful Termination Subclass for holding a one-day strike to protest working conditions. (Dkt. No. 57 at 18.) Defendants' arguments in response focus on whether the issues of individual members of the Wrongful Termination Subclass's intent when they did not go to work on August 4, 2017 and Growers' reason for terminating the subclass members predominate over the common question. (Dkt. No. 67 at 20–21.) Therefore, the Court finds that a common question regarding whether Growers violated Revised Code of Washington section 49.32.020 exists as to the Wrongful Termination Subclass.

#### ii. Unlawful Eviction Claim

A person who "by fraud, intimidation or stealth, or by any kind of violence or circumstance of terror, enters upon or into any real property; or . . . [w]ho, after entering peaceably upon real property, turns out by force, threats or menacing conduct the party in actual

possession" is guilty of forcible entry. Wash. Rev. Code § 59.12.010.

Plaintiffs contend that Growers unlawfully evicted members of the Wrongful Termination Subclass when Growers threatened to call law enforcement and immigration authorities if members of the subclass did not vacate their housing within an hour. (Dkt. No. 57 at 19.) Defendants do not contend that this question is not common to members of the Wrongful Termination Subclass. Therefore, the Court finds that a common question exists regarding whether Growers unlawfully evicted the Wrongful Termination Subclass.

### 3. Typicality

Plaintiffs must next show that the named Plaintiffs' claims are typical of the class and subclasses. Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Ellis*, 657 F.3d at 984 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). The commonality and typicality inquiries "tend to merge" and both serve as "guideposts for determining whether under the particular circumstances[,] maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n. 5. Ultimately, representatives' class claims are typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

Plaintiffs Rosas and Tapia have each declared that the recruiter of Defendant CSI who they met with did not present a labor contractor licensor or say that Defendant CSI had a bond, that they received implicit threats that they would be sent back to Mexico in response to questions or complaints while working for Defendant Sarbanand Farms, that they were present at the meeting where Defendant Perez said they could not take a day off unless they were "on their death beds," that they were held to a production standard not set forth in their employment

contracts, and that they were given food of insufficient quality and quantity. (Dkt. Nos. 59 at 4–8, 60 at 4–9.) These allegations concern the same factual predicates underlying the 2017 Blueberry Harvester Class's common claims, as discussed above, and thus the named Plaintiffs' claims are based on conduct that is not unique to them. *See Ellis*, 657 F.3d at 984.

In response, Defendants contend that the named Plaintiffs' claims are not sufficiently coextensive with those of the 2017 Blueberry Harvester Class because both named Plaintiffs were terminated prior to the conclusion of their employment contract. (Dkt. No. 67 at 11.) Thus, Defendants argue that the named Plaintiffs "are unaware of what happened for the majority of the time spent on the farm." (*Id.*) But the duration of the harm suffered by the named Plaintiffs relative to other members of the 2017 Blueberry Harvester Class is not determinative of the typicality of their claims. Both they and the other members of the 2017 Blueberry Harvester Class were subjected to the same alleged course of harmful conduct by Defendants giving rise to their common claims. *See Ellis*, 657 F.3d at 984; *Hanlon*, 150 F.3d at 1020. The fact that the pattern of alleged misconduct and harm may have subsided after Plaintiffs Rosas and Tapia were terminated does not cure the alleged harms that had already occurred to the 2017 Blueberry Harvester Class. Therefore, the Court finds that the named Plaintiffs' claims are typical of the 2017 Blueberry Harvester Class.

Similarly, Plaintiffs Rosas and Tapia were part of the group of H-2A workers who went on strike and were subsequently terminated and evicted on August 5, 2017. (Dkt. Nos. 59 at 8–10, 60 at 9–11.) Defendants do not contend that the named Plaintiffs' claims are not typical of the Wrongful Termination Subclass. (*See* Dkt. No. 67 at 11.) Further, Plaintiff Tapia was recruited by Defendant CSI because he worked for Defendant Munger Bros. in 2016, and thus any claim he might have against Defendant Perez would be typical of the 2017 Blueberry Harvester Class – Defendant Perez Subclass. (Dkt. No. 60 at 3. Therefore, the Court finds that the named Plaintiffs' claims are typical of the Wrongful Termination Subclass and the 2017 Blueberry Harvester Class – Defendant Perez Subclass.

### 4. Adequacy of Representation

To determine whether the representative parties will adequately represent a class, the Court must examine whether the named Plaintiffs and their counsel (1) have any conflicts of interest with other class members and (2) will prosecute the action vigorously on behalf of the class. *Ellis*, 657 F.3d at 985. The named Plaintiffs have asserted that they understand the claims in this case and the need to think and act on behalf of the class members while following the orders of the Court. (Dkt. Nos. 59 at 2, 60 at 2.) Plaintiffs' counsel have experience in representing workers in class action litigation and will vigorously prosecute this action. (*See* Dkt. Nos. 61, 62.) In response, Defendants only argue that "Plaintiffs have a potential conflict of interest with the [2017 Blueberry Harvester] class in that they worked for [Growers] for a much shorter period, and therefore have less of a vested interest." (Dkt. No. 67 at 12.) Defendant's argument does not present a conflict of interest because the named Plaintiffs' length of exposure to the alleged misconduct does not make Defendants' alleged violations of law any less severe, as discussed above. Therefore, the Court finds that the named Plaintiffs and their counsel will adequately represent the 2017 Blueberry Harvester Class, 2017 Blueberry Harvester Class – Defendant Perez Subclass, and Wrongful Termination Subclass.

## C. Rule 23(b) Requirements

In addition to meeting the Rule 23(a) requirements, a proposed class action must also be maintainable under Rule 23(b)(1), (b)(2), or (b)(3). *Dukes*, 564 U.S. at 345. Plaintiffs seek certification under Rule 23(b)(2) and (b)(3). (*See* Dkt. No. 57 at 1.)

### 1. Rule 23(b)(2)

"[A] class action may be maintained if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Common issues need not predominate for plaintiffs to seek relief under Rule 23(b)(2); "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to

the class as a whole." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). Relief may be appropriate under Rule 23(b)(2) "[e]ven if some class members have not been injured by the challenged practice." *Id*. "Standing . . . is a jurisdictional element that must be satisfied prior to class certification." *LaDuke v. Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985). "[O]nly current employees have standing to seek injunctive relief" under Rule 23(b)(2). *Ellis*, 657 F.3d at 988.

In their complaint and motion for class certification, Plaintiffs seek permanent injunctive relief against several of Defendants' alleged illegal practices. But Plaintiffs concede that putative class members lack standing to seek injunctive relief as they are no longer employed by Defendants. (Dkt. No. 71 at 12.) Therefore, Plaintiffs' request for injunctive relief under Rule 23(b)(2) is DENIED.

Plaintiffs did not request declaratory relief in their complaint or their request for class certification under Rule 23(b)(2). (*See* Dkt. Nos. 12 at 33–35, 57 at 23.) Plaintiffs argue in their reply to Defendants' opposition to class certification that the Court may still grant declaratory relief regardless of the availability of injunctive relief. (*Id*.) (citing *Yniguez v. State of Arizona*, 975 F.2d 646, 647 (9th Cir. 1992) ("A plaintiff's pursuit of nominal damages provides a sufficiently concrete interest in the outcome of the litigation to confer standing to pursue declaratory relief . . . .")). Plaintiffs' argument in their reply brief cannot cure their failure to request declaratory relief pursuant to Rule 23(b)(2) in their complaint. (*See* Dkt. No. 12 at 33–35.) Plaintiffs may move to file a third amended complaint to add a cause of action for declaratory relief, and, thereafter, may move for class certification under Rule 23(b)(2) consistent with this order. If Plaintiffs choose to do so, the parties' arguments should be limited to those not already addressed in this order.

2. Rule 23(b)(3)

A class action may be maintained under Rule 23(b)(3) when "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods

for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615–16 (1997) (explaining that Rule 23(b)(3) requires a two-part analysis of "predominance" and "superiority"). Ultimately, certification under Rule 23(b)(3) is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon*, 150 F.3d at 1023.

### a. Predominance

The predominance inquiry under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This inquiry presumes the existence of common factual or legal issues required under Rule 23(a)'s "commonality" element, focusing instead "on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022; *see Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) ("Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."). "[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (quoting *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). Thus, the analysis of whether a common question of law or fact predominates "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotation omitted).

### i. 2017 Blueberry Harvester Class Claims

### I. FLCA

As discussed above, a common question applicable to the 2017 Blueberry Harvester Class exists as to Defendants' liability for violation of the FLCA stemming from Defendant CSI's alleged recruitment of putative class members without the necessary licensure. (*See supra*

Section II.B.2.a.i.) A common question exists as to Defendant Perez's liability for violation of the FLCA to those putative class members in the 2017 Blueberry Harvester Class who appeared on the list Defendant Perez sent to Defendant CSI to assist in its recruitment of H-2A workers. (*See id*.) Defendants do not contend that individual questions predominate over these particular common questions. (*See* Dkt. No. 67 at 12–14). Both common questions are susceptible to generalized, class-wide proof: whether Defendant CSI improperly recruited putative class members without holding the required license, and whether Defendant Perez engaged in farm labor contracting activity without holding the required license when she sent the list of potential visa applicants to Defendant CSI. Wash. Rev. Code §§ 19.30.010(4)–(5), 19.30.020; *Torres*, 835 F.3d at 1134. The Court finds that the ability to adjudicate the elements of Plaintiffs' FLCA claims in a class action demonstrates that the common factual and legal questions predominate.

## II.    TVPA

The TVPA prohibits a person from obtaining labor or services through a scheme, plan, or pattern intended to cause another "to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(4). In evaluating whether serious harm has been threatened, the court looks to whether "under all the surrounding circumstances . . . a reasonable person of the same background and in the same circumstances [would be compelled] to perform or to continue performing labor or services." 18 U.S.C. § 1589(c)(2).

"According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently serious' to compel the person to remain." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (quoting 18 U.S.C. § 1589(c)(2)). Threats to send an individual back to their home country may constitute serious harm within the scope of 18 U.S.C. § 1589(c)(2). *See id*. at 1172. In addition, the employer must have intended to cause the victim to believe that he or she would suffer serious harm if he or she did not continue to work. *Id*. An allegation that the defendant engaged in a common scheme or practice to coerce

labor from putative class members may be sufficient to establish that the class's claim is susceptible to class-wide resolution. *See, e.g.*, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 920 (10th Cir.), *cert. denied*, 139 S. Ct. 143 (2018) (holding that a court may allow a class to rely on circumstantial evidence shared by the class to establish causation, such as an allegation that defendant coerced labor from putative class through uniform policy).

Under the TVPA, the determination of whether Growers wrongfully obtained labor from the members of the 2017 Blueberry Harvester Class depends on whether Growers threatened serious harm against the members that would have compelled a reasonable person in the same circumstances to perform the labor. *See* 18 U.S.C. §§ 1589(a)(4), 1589(c)(2); *Dann*, 652 F.3d at 1170. Plaintiffs allege that putative class members were threatened with serious harm, in that Growers threatened to terminate them and send them back to Mexico if they asked questions, complained about work conditions, or received three written warnings for not meeting Growers' production standard. (Dkt. Nos. 59 at 6–8, 60 at 6–9; *see generally* Class Decls.); *see Dann*, 652 F.3d at 1172. Contrary to Defendants' assertions that individual inquiries will be necessary to determine whether individual members perceived Growers' statements as threats, the inquiry under the statute focuses on whether a reasonable person in the same circumstances would be compelled to continue to work. *See Dann*, 652 F.3d at 1170; 18 U.S.C. § 1589(c)(2). As the members of the 2017 Blueberry Harvester Class share many salient characteristics, including that they are Mexican nationals, were employed under the same H-2A contracts, worked under the same conditions, and were subjected to the same threats, a uniform reasonable person standard may be applied to determine whether Growers' statements violated the TVPA. *See* 18 U.S.C. § 1589(c)(2). Finally, as Plaintiffs have alleged that Growers' use of the threats was pervasive and directed at the class as a whole (*see* Dkt. Nos. 59 at 6–8, 60 at 6–9; *see generally* Class Decls.), the determination of whether Growers threatened serious harm sufficient to compel a reasonable person to perform labor is susceptible to generalized, class-wide evidence. *See Menocal*, 882 F.3d at 920; *Torres*, 835 F.3d at 1134. Therefore, the Court finds that the common question of

whether Growers violated 18 U.S.C. § 1589(a)(4) predominates over unique issues that may pertain to individual members of the 2017 Blueberry Harvester Class.

The TVPA also prohibits a person from obtaining labor or services through "abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(3). The TVPA defines an "abuse or threatened abuse of law or legal process" as the use or threatened use of such law or legal process "in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). Threats of deportation may constitute an abuse of the legal process within the scope of 18 U.S.C. § 1589(c)(1). *See Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1077 (E.D. Wash. 2013). As discussed above, Plaintiffs have asserted that Growers obtained labor or services from the 2017 Blueberry Harvester Class through pervasive threats to send members who asked questions, complained, or did not meet Growers' production standard back to Mexico. (Dkt. Nos. 59 at 6–8, 60 at 6–9; *see generally* Class Decls.) Such threats may constitute an abuse of the law or legal process sufficient to support a claim under the TVPA. *See Ruiz*, 949 F. Supp. 2d at 1077; 18 U.S.C. §§ 1589(a)(3), 1589(c)(1). As the question of whether Growers' pervasive threats were made in order to exert pressure on the members of the 2017 Blueberry Harvester Class to take action or refrain from taking action in violation of 18 U.S.C. § 1589(a)(3) is susceptible to generalized, class-wide proof, the Court finds that this question predominates over unique issues that may pertain to individual class members. *Torres*, 835 F.3d at 1134.

### III. WLAD

As discussed above, a common question exists as to whether Growers violated the WLAD by creating a hostile work environment. (*See supra* Section II.B.2.a.iii.) Employers are prohibited from discriminating against a person in their terms or conditions of employment based on race or national origin. Wash. Rev. Code § 49.60.180(3). To establish a hostile work environment claim, the plaintiff must establish that the alleged harassment "(1) was unwelcome,

(2) was because of a protected characteristic, (3) affected the terms or conditions of employment, and (4) is imputable to the employer." *Blackburn*, 375 P.3d at 1081.

"In order to constitute harassment[,] the complained of conduct must be unwelcome in the sense that the plaintiff-employee did not solicit or incite it, and in the further sense that the employee regarded the conduct as undesirable or offensive." *Glasgow v. Ga.-Pac. Corp.*, 693 P.2d 708, 712 (Wash. 1985). To establish that the harassment was due to a protected characteristic, the plaintiff "need only produce 'evidence that supports a reasonable inference that [his protected class status] was the motivating factor for the harassing conduct.'" *Alonso v. Qwest Commc'ns Co.*, 315 P.3d 610, 618 (Wash. Ct. App. 2013) (quoting *Doe v. State, Dep't of Transp.*, 931 P.2d 196, 199 (Wash. Ct. App. 1997)). "The harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Glasgow*, 693 P.2d at 712. The harassment may be imputed to the employer when "an owner, manager, partner or corporate officer personally participates in the harassment." *Id.*

In this case, Plaintiffs have alleged that Defendants engaged in a pervasive practice of threatening to send putative class members back to Mexico if they asked questions, made work-related complaints, or failed to meet Growers' production standard. (*See* Dkt. Nos. 59 at 6–8, 60 at 6–9; *see generally* Class Decls.) Plaintiffs also allege that Defendant Perez told the class at a meeting that they were expected to work every day, and only those "on their death beds" could remain in their housing when they were supposed to be working. (Dkt. Nos. 59 at 6, 60 at 6; *see generally* Class Decls.) The alleged threats and comments made by Defendants were pervasive and substantially identical between members of the 2017 Blueberry Harvester Class. Moreover, they uniformly promised negative consequences for members who attempted to improve working conditions or failed to meet Growers' expectations. Therefore, establishing each member's *prima facie* case of Growers' liability for creating a hostile work environment would depend on the same evidence of Defendants' behavior. *Torres*, 835 F.3d at 1134.

Similarly, many of the threats made to putative class members focused on their Mexican

nationality, the threats were made to the class as a whole or were pervasively made to individual members, and the threats were allegedly made by Growers' managers or officers. (Dkt. Nos. 59 at 6–8, 60 at 6–9; *see generally* Class Decls.) Therefore, the issues of whether there is a reasonable inference that class members' national origin was the motivating factor for the harassing conduct, whether the harassment was pervasive enough to create a hostile work environment, and the imputation of the harassment to Growers are all susceptible to generalized, class-wide proof. *See Torres*, 835 F.3d at 1134. The Court finds that the common question of whether Growers are liable under the WLAD for creating a hostile work environment predominates over unique issues that may pertain to individual members of the 2017 Blueberry class. *See Torres*, 835 F.3d at 1134.

## IV.     Breach of Contract

As discussed above, a common question exists as to the 2017 Blueberry Harvester Class regarding whether Growers breached the H-2A contracts by imposing a previously undisclosed production standard and by providing low quality food in insufficient quantities to meet class members' daily needs. (*See supra* Section II.B.2.a.iv.) "A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995). Washington applies the objective manifestation theory of contracts, under which the Court "attempt[s] to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). "Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." *Id.*

Under Washington law, individual class members' interpretations of the terms of the H-2A contracts are not determinative on the issue of Growers' liability for breach of the contracts. Rather, Growers' liability will depend on (1) whether imposition of a production standard of two

boxes of blueberries an hour and (2) providing low-quality food in meager quantities violated the parties' objective manifestations in the H-2A contracts. *See id.* Thus, the issue of whether Growers owed duties to putative class members under the H-2A contracts that were breached by the imposition of a new production standard and the provision of low-quality food in insufficient quantities, and thus caused harm to putative class members, is susceptible to generalized, class-wide proof. *See Torres*, 835 F.3d at 1134. Therefore, the Court finds that the common questions on this issue predominate over unique issues raised by individual class members.

### ii.    Wrongful Termination Subclass

#### I.    Termination for Engaging in Protected Activities

As discussed above, a common question exists as to whether Growers violated Revised Code of Washington section 49.32.020 when they terminated the members of the Wrongful Termination Subclass following a one-day strike. (*See supra* Section II.B.2.b.i.) To prevail on a claim of wrongful discharge, a plaintiff must establish that "(1) Washington has a clear public policy (the *clarity* element), (2) discouraging the conduct would jeopardize the public policy (the *jeopardy* element), and (3) that policy-protected conduct caused the dismissal (the *causation* element)." *Briggs v. Nova Servs.*, 213 P.3d 910, 914 (Wash. 2009). Under Washington law, employers are prohibited from interfering with, restraining, or coercing labor employees engaging "in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections." Wash. Rev. Code § 49.32.020. The concerted activities must relate to the terms and conditions of employment or be seeking improved working conditions. *Briggs*, 213 P.3d at 915.

Washington has a clear public policy of allowing employees to engage in concerted activities to seek improved working conditions. *See Briggs*, 213 P.3d at 914; Wash. Rev. Code § 49.32.020. Terminating employees in retaliation for engaging in such activities would clearly discourage the conduct. *Briggs*, 213 P.3d at 914. Plaintiffs assert that members of the Wrongful Termination Subclass were engaged in a protected activity when they did not attend work on

August 4, 2017 because they were protesting harsh working conditions. (*See* Dkt. Nos. 59 at 9, 60 at 9–10; *see generally* Class Decls.) Plaintiffs further assert that the Wrongful Termination Subclass was terminated for engaging in this protected activity, as one of Growers' managers was present at the meeting during which the decision to strike was reached and subclass members were given identical separation and termination forms which described them as "Protestor[s]" and stated that they were terminated for "insubordination." (Dkt. Nos. 57 at 19, 61-7, 61-8.) Therefore, Plaintiffs have established that the same evidence will suffice for each member of the Wrongful Termination Subclass to make a *prima facie* showing of wrongful termination in violation of Washington employment law. *See Torres*, 835 F.3d at 1134.

In response, Defendants argue that not all members of the Wrongful Termination Subclass were engaged in protected activities when they did not go to work on August 4, and thus the Court will have to make individualized inquiries of each member. (Dkt. No. 67 at 21.) For example, Defendants argue that Plaintiff Tapia decided on August 4 that he did not want to participate in the strike after all and requested to be allowed to work, and another member of the Wrongful Termination Subclass stated that he was simply late to work on August 4 and was subsequently terminated. (*Id.*) (citing Dkt. Nos. 60 at 10, 69 at 5, 70 at 1.) Although Defendants have highlighted that some members of the Wrongful Termination Subclass may have unique issues related to this claim, such issues do not predominate over the common question of whether the Wrongful Termination Subclass as a whole engaged in protected activity and was subsequently terminated for doing so.

Defendants also argue that the Court must determine the reason for the Wrongful Termination Subclass's terminations, and that individualized inquiries will be required to determine why each member was terminated. (Dkt. No. 67 at 21.) The question of why Defendants terminated all of the members of the Wrongful Termination Subclass at the same time on August 5, 2017 is the very question that may be answered on a class-wide basis. Further, the question of why each subclass member was terminated may be resolved by the same

evidence, as the subclass members were allegedly provided with identical separation and termination forms. (*See* Dkt. Nos. 57 at 19, 61-7, 61-8, 71 at 5.) Therefore, Defendants' arguments do not demonstrate that the common question identified above does not predominate over issues raised by individual members of the subclass.

Thus, the Court finds that the common question of whether Growers violated Washington employment law when they terminated the Wrongful Termination Subclass on August 5, 2017 predominates over unique issues pertaining to individual subclass members.

## II. Unlawful Eviction

As discussed above, a common question exists as to whether Growers wrongfully evicted members of the Wrongful Termination Subclass. (*See supra* Section II.B.2.b.ii.) A person who uses threats or menacing conduct to turn out a party in actual possession of real property is liable for forcible entry. Wash. Rev. Code. § 59.12.010. Plaintiffs contend that after the members of the Wrongful Termination Subclass were terminated, Defendants demanded that the subclass members vacate their housing within one hour. (Dkt. No. 57 at 19; *see* Dkt. Nos. 59 at 10, 60 at 11; *see generally* Class Decls.) Plaintiffs further allege that Defendants threatened to call the police and immigration officials to enforce their demands. (*Id*.) Defendants do not argue that individual claims of subclass members predominate over the common question presented for this claim. (*See generally* Dkt. No. 67 at 12–22.) Therefore, the Court finds that resolution of this claim of the Wrongful Termination Subclass depends on generalized, class-wide proof, and that the common question predominates over individual issues of subclass members. *See Torres*, 835 F.3d at 1134.

### b. Superiority

Rule 23(b)(3) requires that the Court find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). When undertaking this inquiry, the Court considers (1) the interest of individuals within the class in controlling their own litigation; (2) the extent and nature of any pending litigation commenced

by or against the class involving the same issues; (3) the convenience and desirability of concentrating the litigation in a particular forum; and (4) the manageability of the class action. *See* Fed. R. Civ. P. 23(b)(3)(A)–(D); *Zinzer v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190–92 (9th Cir. 2001). Consideration of these factors must "focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinzer*, 253 F.3d at 1190.

In this case, a class action is superior to other available methods of adjudicating the claims of the 2017 Blueberry Harvester Class, 2017 Blueberry Harvester Class – Defendant Perez Subclass, and Wrongful Termination Subclass.[7] Based on the record before the Court, it does not appear that individual class members have an interest in controlling their own litigation, as each individual class or subclass member's claim for damages is unlikely to exceed the cost of pursuing the claims alleged. *See Saucedo v. NW Mgmt. & Realty Servs., Inc.*, 290 F.R.D. 671, 684–85 (E.D. Wash. 2013). It does not appear that other litigation regarding this action is pending elsewhere. *See id.* at 685; (Dkt. No. 57 at 22.) The parties have not argued that the Western District of Washington is not an appropriate and convenient forum for the litigation. *See Saucedo*, 290 F.R.D. at 685. It does not appear that there are issues with regard to the manageability of the class action. *See id.* Therefore, Plaintiffs have established that class action litigation is superior to other methods of adjudicating this action.

### D.    Class Definitions

The Court has discretion to modify class definitions where appropriate. *Booth v. Appstack, Inc.*, 2015 WL 1466247, slip op. at 5 (W.D. Wash. 2015) (citing *Armstrong v. Davis*, 275 F.3d 849, 872 (9th Cir. 2001)). Based on the preceding analysis, the Court hereby defines and CERTIFIES the follow classes under Rule 23(b)(3):

2017 Blueberry Harvester Class: "All Mexican nationals who worked at Sarbanand

---

[7] Defendants do not substantively argue that class treatment would not be superior in this case. (*See* Dkt. No. 67 at 12–24.)

Farms, LLC in Sumas, Washington picking blueberries pursuant to an H-2A contract that offered employment from July 2017 through October 2017." The 2017 Blueberry Harvester Class is certified on the following claims raised by Plaintiffs: Defendant CSI's violation of the FLCA and Growers' resultant liability; Growers' violation of the TVPA, 18 U.S.C. § 1589(a)(3) and 18 U.S.C. § 1589(a)(4); Growers' creation of a hostile work environment in violation of the WLAD; Growers' breach of the H-2A contracts.

2017 Blueberry Harvester Class – Defendant Perez Subclass: "Mexican nationals who worked for Defendant Sarbanand Farms in 2015 and/or 2016 and appeared on a list sent by Defendant Perez to Defendant CSI for potential visa applications for work with Defendant Sarbanand Farms in 2017." The 2017 Blueberry Harvester Class – Defendant Perez Subclass is certified on Plaintiffs' claim that Defendant Perez is liable for violation of the FLCA and Growers' resultant liability.

Wrongful Termination Subclass: "H-2A workers who were terminated and evicted from Sarbanand Farms for protesting dangerous working conditions." The Wrongful Termination Subclass is certified on the following claims raised by Plaintiffs: Growers' wrongful termination of the subclass in violation of Revised Code of Washington section 49.32.020; Growers' unlawful eviction of the subclass in violation of Revised Code of Washington section 59.12.010.

### E. Appointment of Class Counsel

"Unless a statute provides otherwise, a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, the Court considers the work counsel has done to identify and investigate potential claims; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). Plaintiffs' counsel have experience in handling class actions concerning the types of claims asserted in this case, and have extensive knowledge of the applicable law. (Dkt. Nos. 61, 62.) Plaintiffs' counsel has also committed to expend the

resources necessary to represent the class. (*Id.*) For the foregoing reasons, Plaintiffs' counsel in this case are hereby APPOINTED as class counsel.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification (Dkt. No. 57) is GRANTED pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

DATED this 20th day of December 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE